**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>Signia, Ltd.,<br><br>Debtor. | Bankruptcy Case No. 24-13438-TBM<br>Chapter 11 |

# ORDER ON MOTION TO DISMISS BANKRUPTCY CASE

## I. Introduction.

The dispute before the Court is the latest chapter in the long saga of litigation between the Debtor, Signia, Ltd. (the "Debtor"), and its principal creditors, Male Excel Medical, P.A. and Male Excel, Inc. (together, "Male Excel"). About five years ago, Male Excel sued the Debtor (which had been providing sales and marketing services to Male Excel) in Nevada State Court. In 2023, the Nevada State Court entered a Judgment in favor of Male Excel and against the Debtor in the amount of $2,051,745, plus attorneys' fees, costs, and interest (as defined below, the "Judgment"). Male Excel has asserted that the amount of debt owed by the Debtor under the Judgment has ballooned to about $5,376,730. The Debtor appealed; but despite the passage of many years, no appellate decision has been forthcoming. Meanwhile, Male Excel commenced efforts to collect on the Judgment.

In 2023, the Debt filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code[1] to forestall execution on the Judgment. At the Debtor's request (after an adverse decision issued by the Court), the Court dismissed the Debtor's first foray into bankruptcy. Undeterred, the Debtor started the current bankruptcy case: *In re Signia, Ltd.*, Case No. 24-13438 (Bankr. D. Colo.) in 2024. After two and a half years more of bankruptcy litigation, not much has been accomplished. Earlier this year, Male Excel filed a "Motion to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. § 1112(b)." (Docket No. 378, the "Motion to Dismiss.") Thereafter, the Debtor filed a "Response" in opposition to the Motion to Dismiss. (Docket No. 398, the "Response"). No other creditor or party in interest has weighed in on the Motion to Dismiss. The Court conducted a trial on the Motion to Dismiss and Response. Now, for the reasons set forth, and reluctantly, the Court denies the Motion to Dismiss (at least at this time).

[1] All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

## II. Jurisdiction and Venue.

This Court has jurisdiction to enter final judgment on the Motion to Dismiss and Response pursuant to 28 U.S.C. § 1334. A motion to dismiss or convert a Chapter 11 case for "cause" under Section 1112(b) is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate) and (b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship). Furthermore, no party has contested the Court's exercise of jurisdiction and entry of final judgment on the Motion to Dismiss and Response. So, the Court finds that it has jurisdiction to enter final judgment on the Motion to Dismiss and Response. Venue to consider the Motion to Dismiss and Response appears proper in this Court because the Debtor's current bankruptcy was filed in this Court. No party challenged the Debtor's choice of venue in the District of Colorado. Thus, the Court finds that venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III. Procedural Background.[2]

### A. The Nevada State Action and Judgment.

About six years ago, Male Excel sued the Debtor (which had been providing sales and marketing services to Male Excel) for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and intentional misrepresentation in the case captioned: *Male Excel Medical, P.A. et al. v. Signia Marketing, Ltd.,* Case No. A-20-816167-B (Eighth Judicial District Court (Department No. 13), Clark County, Nevada) (the "Nevada State Action").[3] After several years of pre-trial litigation, the Nevada State Court conducted a trial from May 16, 2023 through June 14, 2023.[4] On August 16, 2023, the Nevada State Court entered "Findings of Fact, Conclusions of Law, and Judgment" (previously identified as the "Judgment") in

---

[2] The Court takes judicial notice of the Dockets in the First Bankruptcy Case, the Second Bankruptcy Case, the Federal Court Action, and this Adversary Proceeding (all as defined below). *See St. Louis Baptist Temple, Inc. v. F.D.I.C.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may *sua sponte* take judicial notice of its own docket and "in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue."). Most of the Court's recitation of the Procedural Background also stems from the Stipulated Facts (as identified hereinafter).

[3] Second Bankruptcy Case Docket No. 44 at 1. The Court uses the convention "First Bankruptcy Case Docket No. ___" to refer to documents filed in the Court's CM/ECF docket system in the bankruptcy case: *In re Signia, Ltd.*, Case No. 23-14384 TBM (Bankr. D. Colo.) (the "First Bankruptcy Case"). The Court uses the convention "Second Bankruptcy Case Docket No. ___" to refer to documents filed in the Court's CM/ECF docket system in this bankruptcy case: *In re Signia, Ltd.*, Case No. 24-13438 TBM (Bankr. D. Colo.) (the "Second Bankruptcy Case"). The Court uses the convention "Federal Case Docket No. ___" to refer to documents filed in the Colorado Federal Court's CM/ECF docket system in the Federal Court Action: *Male Excel Medical, P.A., et al. v. Trexler et al.*, Case No. 1:24-cv-02539-KAS (D. Colo.) (the "Federal Court Action"). The Court uses the convention "Adversary Proceeding Docket No. ___" to refer to documents filed in the Court's CM/ECF docket system in: *Signia Ltd. v. Male Excel Medical, P.A. and Male Excel, Inc. (In re Signia, Ltd.)*, Adv. Pro. No. 24-1214 TBM (Bankr. D. Colo.) (the "Adversary Proceeding").

[4] Second Bankruptcy Case Claim No. 4 at 11.

the Nevada State Action.[5] The Judgment is quite comprehensive and spans more than 72 pages of text. In the Judgment, the Nevada State Court entered judgment in favor of Male Excel and against the Debtor for breach of contract and unjust enrichment in the amount of $2,051,745.00, plus unspecified attorneys' fees, costs, and interest.[6] On September 21, 2023, the Debtor appealed the adverse Judgment to the Nevada Supreme Court without posting a supersedeas bond (the "Nevada Appeal").[7] As of now, years later, the Nevada Supreme Court has not yet issued a decision on the Nevada Appeal.

## B. <u>The First Bankruptcy Case</u>.

As a mechanism to stop execution on the Judgment, a few days later, on September 27, 2023, the Debtor filed for bankruptcy protection under Chapter 11 Subchapter V of the Bankruptcy Code in the First Bankruptcy Case: *In re Signia, Ltd.*, Case No. 23-14384 TBM (Bankr. D. Colo.).[8] The First Bankruptcy Case was hotly contested. As relevant to the current dispute, the Debtor filed a "Motion for Relief from Stay"[9] requesting relief from stay to prosecute the Nevada Appeal in the Nevada Supreme Court. However, the Debtor did not ask for relief from stay to allow the Nevada State Court to finalize the amount of attorneys' fees and costs under the Judgment nor to permit Male Excel to submit a cross-appeal. Accordingly, Male Excel filed a "Counter-Motion for Relief from Stay"[10] requesting relief from stay to finalize the amount of attorneys' fees and costs in the Nevada State Court and to permit both the Debtor and Male Excel to pursue appellate remedies. After further contests, the Court granted both the foregoing "Motion for Relief from Stay" and the "Counter-Motion for Relief from Stay,"[11] thereby allowing the parties to (1) proceed to finalize attorneys' fees and costs (as well as ancillary issues pertaining to the Judgment) in the Nevada State Court; and (2) prosecute any appeals or cross-appeals in the Nevada Supreme Court. Subsequently, on June 4, 2024, the Nevada State Court entered an "Order Granting Motion for Attorney Fees and Costs" granting Male Excel attorneys' fees in the amount of $788,844.14 and costs in the amount of $319,139.12.[12] (When referring to the "Judgment" hereinafter, the Court includes the additional amounts awarded by the Nevada State Court for attorneys' fees and costs.) The Debtor promptly appealed again to the Nevada Supreme Court.[13] (When referring to the "Nevada Appeal" hereinafter, the Court includes the second appeal by the Debtor.)

The Debtor did not comply with the timing requirements for filing a Subchapter V plan. Thereafter, the Court entered an "Opinion and Order Denying Motion to Extend

---

5 *Id*. at 11-84; Second Bankruptcy Case Docket No. 44 at 1.
6 *Id.*
7 Second Bankruptcy Case Docket No. 44 at 1.
8 First Bankruptcy Case Docket No. 1.
9 First Bankruptcy Case Docket No. 43.
10 First Bankruptcy Case Docket No. 75.
11 First Bankruptcy Case Docket Nos. 83, 84, 128, and 129.
12 Second Bankruptcy Case Claim No. 4 at 89-94.
13 *Id*. at 98-99.

Plan Filing Date."[14] Subsequently, the Debtor filed a "Motion to Dismiss Case Pursuant to 11 U.S.C. § 1112(b)(1),"[15] which Male Excel opposed.[16] More litigation ensued. Months later, Male Excel withdrew its opposition to dismissal.[17] Accordingly, on June 12, 2024, the Court entered an Order dismissing the First Bankruptcy Case.[18]

## C. **The Second Bankruptcy Case**.

A few weeks after the dismissal of the First Bankruptcy Case, on June 20, 2024, the Debtor decided to try again and filed for bankruptcy protection under Chapter 11 Subchapter V of the Bankruptcy Code in the Second Bankruptcy Case: *In re Signia, Ltd.*, Case No. 24-13438 TBM (Bankr. D. Colo.).[19] In its Schedules filed in the Second Bankruptcy Case, the Debtor did not identify any alter ego claims owned by the Debtor against its direct parents, Sulit Group Ltd. or Vero Investment Co., or any other affiliated persons or entities (including Jeffrey Fell, Alfred Trexler, Vero Investment Co., JAFT Ventures, LLC, or National Research and Polling Group, Ltd.).[20] Promptly after the commencement of the Second Bankruptcy Case, Male Excel filed Proof of Claim No. 4 asserting a general unsecured claim against the Debtor based on the Judgment in the amount of $4,469,565.48 to $5,376,730.63. Male Excel is the largest general unsecured creditor of the Debtor.

Like the First Bankruptcy Case, the Second Bankruptcy Case also has been hotly contested. However, the Debtor and Male Excel stipulated to relief from stay to allow the parties to continue to prosecute and defend the Nevada Appeal.[21] On July 22, 2024, the Court entered an Order granting relief from stay for the parties to continue the prosecution and defense of the Nevada Appeal (including cross-appeals).[22] However, for reasons unclear to the Court, the Nevada Supreme Court has not ruled on the merits of the Nevada Appeal.

More fights ensued. The Debtor withdrew its Subchapter V election and is proceeding in a standard Chapter 11 reorganization.[23] The Debtor has submitted a series of Chapter 11 Disclosure Statements and Plans;[24] however, to date, the Court has not confirmed any of the Debtor's proposed Plans.

---

14 First Bankruptcy Case Docket No. 168.
15 First Bankruptcy Case Docket No. 208.
16 First Bankruptcy Case Docket No. 220.
17 First Bankruptcy Case Docket No. 349.
18 First Bankruptcy Case Docket No. 354.
19 Second Bankruptcy Case Docket No. 1.
20 *Id*.
21 Second Bankruptcy Case Docket No. 44.
22 Second Bankruptcy Case Docket No. 79.
23 Second Bankruptcy Case Docket No. 102.
24 Second Bankruptcy Case Docket Nos. 130, 131, 183, 184, 187, 350, 351, 366, 367.

## D. <u>The Colorado Federal Court Action</u>.

Meanwhile, apparently frustrated with its inability to collect on the Judgment during the First Bankruptcy Case and the Second Bankruptcy Case, Male Excel hit on another litigation gambit (which had been percolating in the background for many months). On September 16, 2024, Male Excel filed a lawsuit in the United States District Court for the District of Colorado (the "Colorado Federal Court") captioned: *Male Excel Medical, P.A. et al. v. Alfred Trexler et al.,* Case No. 1:24-cv-02539-KAS (D. Colo.) (the "Federal Court Action"). The Defendants in the Federal Court Action are: Alfred Trexler ("Mr. Trexler"); Jeffrey Fell ("Mr. Fell"); Sulit Group, Ltd ("Sulit Group"); Vero Investment Co. ("Vero Investment"); JAFT Ventures, LLC ("JAFT Ventures"); and National Research and Polling Group, Ltd. ("NRPG") (together, the "Federal Court Defendants"). Notably, the Debtor is not a Defendant in the Federal Court Action.

According to the Complaint in the Federal Court Action (the "Federal Court Complaint"): "This is a veil-piercing action to enforce a judgment entered in favor of Male Excel and against non-party judgment debtor Signia Marketing, Ltd. [in the Nevada State Action]."[25] Male Excel asserted that:

> 3. . . . Signia was never a properly operated corporate entity with a personage separate and distinct from that of the Defendants. Rather, Signia at all times relevant hereto was a sham entity dominated and controlled by the following alter egos:
>
> a. Two individual insiders: Defendants Alfred Trexler and Jeffrey Fell, and
>
> b. A web of insider entities: Defendants Sulit Group, Ltd., Vero Investment Co., JAFT Venture, LLC and National Research and Polling Group, Ltd. (collectively, the "Entity Defendants").
>
> 4. Basic corporate formalities in the management and operation of Signia were completely disregarded, and instead Defendants improperly treated Signia and the Entity Defendants as a single economic unit.
>
> 5. Male Excel is compelled to seek an order from this Court piercing the corporate veil to hold all Defendants, and each of them, jointly and severally liable for the obligations of Signia, including the Nevada Judgment . . . .[26]

---

[25] Federal Case Docket No. 14 at 22.
[26] Federal Case Docket No. 14 at 23.

In the Federal Court Complaint, Male Excel alleged that Sulit Group owns 80% of the Membership Interests in the Debtor and Vero Investment owns the remaining 20% of the Membership Interests in the Debtor.[27] Per the Federal Court Complaint, Mr. Fell owns 50% of the equity in the Sulit Group and Mr. Trexler owns the remaining 50% of the equity in the Sulit Group.[28] Furthermore, Male Excel alleged that Mr. Fell wholly-owns Vero Investment. According to the Federal Court Complaint, NRPG is owned 70% by the Sulit Group and 30% by Vero Investment.[29] Finally, Male Excel asserted that Sulit Group owns 98% of the equity in JAFT Ventures while Vero Investment owns the remaining 2% of the equity in JAFT Ventures.[30]

So, based upon the factual allegations in the Federal Action Complaint (and as expressly stipulated between the Debtor and Male Excel),[31] the corporate structure of Signia and the Federal Court Defendants is as follows graphically:

---

27 Federal Case Docket No. 14 at 28.

28 Federal Case Docket No. 14 at 29.

29 *Id.*

30 Federal Case Docket No. 14 at 30.

31 *See also* Second Bankruptcy Case Docket No. 253 at 7-9 (Debtor and Male Excel stipulated that: “Debtor is organized as a Colorado limited liability company”; “Signia Marketing, Ltd. and Signia, Ltd. are the same entity”; “Debtor is owned 80% by Sulit and 20% by Vero”; Sulit Group is a Colorado corporation “owned 50% by Trexler and 50% by Fell”; NRPG is a Colorado limited liability company “owned 70% by Sulit and 20% by Vero”; JAFT Ventures is a Colorado limited liability company “owned 98% by Sulit and 2% by Vero.”; Vero Investment is a Colorado corporation “owned 100% by Fell”). The foregoing matches with the allegations in the Federal Court Complaint except for what appears to be a typographical discrepancy concerning Vero Investment’s ownership of NRPG. The discrepancy is not material.




In the Federal Court Complaint, Male Excel proposed to "pierce" all the various corporate veils so that all the Federal Court Defendants become liable for payment of the Judgment. In support of such position, Male Excel contended, among other things, that: (1) "The Same Individuals and Firms Perform Work for Signia and the Defendants"; (2) "Signia and the Entity Defendants All Conduct Business Through a Sulit Email Address"; (3) "Signia and the Entity Defendants Purportedly Operate Out of the Same Location"; (4) "Signia Aided Insider JAFT in Financing the Purchase of Real Property and Received No Consideration"; (5) Signia Has a "Nonstandard Landlord-Tenant Relationship with JAFT"; (6) "Signia and the Defendants[] Commingled Funds;" (7) "Signia and the Defendants Entered Into Numerous Promissory Notes Lacking Consideration"; (8) "Signia [has an] Unusual and Undefined Client Relationship with NRPG"; (9) "Signia and the Defendants Maintain Inadequate Corporate Records"; (10) [The] "Nature and Form of Signia's Ownership and Control Facilitate[s] Misuse by Insiders"; (11) Signia and the Federal Court Defendants "Lack [] [Proper] Capitalization"; and (12) Signia and the Federal Court Defendants "Disregard [ ] Legal Formalities."[32] The foregoing are section headings used by Male Excel in the Federal Court Complaint.

At the end of the Federal Court Complaint, Male Excel asserted two causes of action: (1) "Alter Ego Liability Against All Defendants"; and (2) "Declaratory Judgment Against All Defendants."[33] Although structured as two claims, Male Excel requested the

---

32 Federal Case Docket No. 14 at 30-44.
33 *Id.* at 46-48.

same principal relief: "an order declaring Defendants to be alter egos of Signia" and "an order declaring Defendants to be jointly and severally liable for the obligations of Signia, including the Nevada Judgment . . . ."[34] The Court refers to the foregoing claims in the Federal Court Complaint as the "Alter Ego Claims." Male Excel also asked for unspecified "damages" as well as "attorney fees and costs."[35] The Colorado Federal Action has not proceeded very far and is currently in the discovery stage.

## E. <u>The Settlement Agreement</u>.

Meanwhile, the day after Male Excel commenced the Federal Court Action, the Debtor embarked on its own counter-strategy to block Male Excel from pursuing alter ego claims against the Federal Court Defendants. On September 17, 2024, the Debtor filed a "Motion to Approve Settlement Agreement Between Signia and Related Entities" (the "Settlement Motion").[36] Through the Settlement Motion, the Debtor sought Court approval for a Settlement Agreement ("the "Settlement Agreement") attached to the Settlement Motion.[37]

The premise of the Settlement Motion and Settlement Agreement was the Debtor's contention that it exclusively owns — as property of the bankruptcy estate under Section 541(a) — the alter ego claims against its own corporate parents (Sulit Group and Vero Investment) as well as Mr. Fell, Mr. Trexler and related entities (JAFT Ventures and NRPG) all of whom constitute the Federal Court Defendants.[38] The Debtor contended that "there is no factual basis to assert claims against any of the Related Entities [Federal Court Defendants]."[39] Nevertheless, ironically, the Debtor proposed to "settle" the alter ego claims against the Federal Court Defendants (its own corporate parents, Mr. Fell, Mr. Trexler, and JAFT Ventures and NRPG) and another related entity mainly by compromising the amounts of certain of the claims of the Federal Court Defendants against the Debtor in the Second Bankruptcy Case. In return, the Debtor proposed to release the Federal Court Defendants.[40]

Male Excel opposed the Settlement Motion and argued, among other things, that the Settlement Agreement was a facially bad faith effort to protect the Debtor's insiders: the Federal Court Defendants.[41] After further discovery and litigation, the Court conducted a two-day trial on the Settlement Motion on March 31 and April 1, 2025.[42]

Following trial, the Court issued an Opinion denying approval of the Settlement Agreement primarily on the grounds that it was not "a fair and equitable settlement for

---

34 *Id*. at 48.
35 *Id*.
36 Second Bankruptcy Case Docket No. 109.
37 Second Bankruptcy Case Docket No. 109-1.
38 Second Bankruptcy Case Docket No. 109 at 4 ("the Agreement contemplates the compromise only of potential claims and causes of action that belong to Signia and the bankruptcy estate.").
39 *Id*. at 5.
40 Second Bankruptcy Case Docket No. 109-1 at 4-5 (emphasis added).
41 Second Bankruptcy Case Docket No. 139 at 9-11.
42 Second Bankruptcy Case Docket Nos. 260 and 261.

the benefit of the Debtor's non-insider general unsecured creditors."[43] *In re Signia, Ltd.*, 2025 WL 2694029, at *6-8 (Bankr. D. Colo. Aug. 1, 2025).

### F. **<u>The Adversary Proceeding</u>.**

The day after filing the Settlement Motion, on September 18, 2024, the Debtor embarked on another front in the incessant litigation war by initiating an Adversary Proceeding: *Signia Ltd. v. Male Excel Medical, P.A. and Male Excel, Inc. (In re Signia, Ltd.)*, Adv. Pro. No. 24-1214 TBM (Bankr. D. Colo.).[44]

#### 1. **<u>The Amended Complaint</u>.**

A few weeks after starting the Adversary Proceeding, the Debtor filed a "First Amended Complaint for (A) Declaratory and Injunctive Relief and (B) Damages" (the "Amended Complaint").[45] The Amended Complaint was the operative pleading advanced by the Debtor and basically is a mirror-image of the Federal Court Defendants' Motion to Dismiss the Federal Court Action. The purpose of the Amended Complaint was to block Male Excel from pursuing the Federal Court Action against the non-Debtor Federal Court Defendants by asserting that the Debtor owns the Alter Ego Claims advanced by Male Excel. The Debtor asserted a single cause of action for violation of the Section 362(a)(3) automatic stay: "Declaratory and Injunctive Relief, Damages – Violation of the Automatic Stay."[46] Additionally, the Debtor requested an award of damages for alleged "willful and deliberate" violation of the Section 362(a)(3) automatic stay.

Meanwhile, the Debtor also asked for injunctive relief and submitted a "Motion for (A) Temporary Restraining Order; (B) Preliminary Injunction; and (C) Forthwith Hearing" (the "Injunctive Motion").[47] Shortly thereafter, the Debtor filed a "Supplement to Motion for (A) Temporary Restraining Order; (B) Preliminary Injunction; and (C) Forthwith Hearing" (the "Supplement").[48] In any event, the Court denied the issuance of a temporary restraining order and joined the request for a preliminary injunction with a trial on the merits of the Adversary Proceeding.[49]

#### 2. **<u>Dismissal of the Adversary Proceeding</u>.**

Instead of answering the Amended Complaint, Male Excel requested that the Court dismiss the Amended Complaint for "failure to state a claim upon which relief can be granted" pursuant to Fed. R. Civ. P. 12(b)(6), which is applicable per Fed. R. Bankr. P. 7012(b). Male Excel asserted two main arguments in support of dismissal: (1) the Section 362(a) automatic stay does not apply to actions (like the Federal Court Action)

---

43 Second Bankruptcy Case Docket No. 312 at 31.
44 Adversary Proceeding Docket No. 1.
45 Adversary Proceeding Docket No. 4.
46 Adversary Proceeding Docket No. 4 at 3.
47 Adversary Proceeding Docket No. 5.
48 Adversary Proceeding Docket No. 10.
49 Adversary Proceeding Docket No. 12.

brought against non-debtor third parties; and (2) the right to recover on Male Excel's Alter Ego Claims in the Federal Court Action is not "property of the [bankruptcy] estate." As a result, Male Excel contended that (even accepting the factual allegations in the Amended Complaint as true) the Debtor could not state a claim for violation the Section 362(a)(3) automatic stay. Thereafter, the Debtor opposed dismissal of the Amended Complaint. The Debtor conceded that (subject to certain exceptions not applicable in the Adversary Proceeding) the Section 362(a) stay does not apply to third parties such as the Federal Court Defendants. But, the Debtor noted that it was not asking for the Section 362(a) stay to be extended to the Federal Court Defendants. Instead, the Debtor's position was that Male Excel violated the Section 362(a)(3) stay because the Alter Ego Claims asserted in the Federal Court Action are "property of the [bankruptcy] estate."

On May 14, 2025, the Court entered its "Order Granting Motion to Dismiss" and "Judgment" (together, the "Adversary Proceeding Dismissal Order and Judgment"),[50] wherein the Court dismissed the Amended Complaint in the Adversary Proceeding. Thereafter, on May 27, 2025, the Debtor appealed Adversary Proceeding Dismissal Order and Judgment to the United States Bankruptcy Appellate Panel of the Tenth Circuit (the "10th Circuit BAP") in the appeal captioned: *Signia, Ltd. v. Male Excel Medical, P.A. et al. (In re Signia, Ltd.)*, BAP No. C)-25-17 (10th Cir. BAP). Most recently, on August 28, 2026, the 10th Cir. BAP entered an order (the "Remand Order") remanding the case to this Court "for it to consider Debtor's standing to bring the adversary proceeding."[51] The Court has not yet determined the Debtor's standing to bring the Adversary Proceeding. Yet another issue for another day.

## G. <u>The Motion To Dismiss Second Bankruptcy Case</u>.

"From ancient grudge break to new mutiny."[52] The long-running disputes in the Second Bankruptcy Case continued to spiral amidst a flurry of new motions from the Debtor and Male Excel. Most recently, on May 14, 2026, Male Excel filed the Motion to Dismiss the Second Bankruptcy Case.[53] Unsurprisingly, the Debtor opposed the Motion to Dismiss Bankruptcy Case in its Response.[54]

The Debtor filed an Objection to Male Excel's claim (the "Debtor's Claim Objection")[55] which Male Excel opposed.[56] Male Excel filed a "Expedited Unopposed Motion to Temporarily Allow Male Excel's Claim for Plan Voting Purposes"[57] (the "Temporary Allowance Motion") which the Debtor partially opposed.[58] The Debtor also

---

50 Adversary Proceeding Docket Nos. 21 and 23.
51 Adversary Proceeding Docket No. 32
52 WILLIAM SHAKESPEARE, ROMEO AND JULIET act 1, prologue, l. 3.
53 Second Bankruptcy Case Docket No. 378.
54 Second Bankruptcy Case Docket No. 398.
55 Second Bankruptcy Case Docket No. 372.
56 Second Bankruptcy Case Docket No. 393.
57 Second Bankruptcy Case Docket No. 377.
58 Second Bankruptcy Case Docket No. 386.

filed a "Motion to Designate Vote of Male Excel"[59] (the "Motion to Designate") and Male Excel, of course, objected.[60] And, the Debtor wants to confirm its "Fourth Amended Plan of Reorganization dated March 18, 2026" (the "Fourth Plan"),[61] which Male Excel opposes.[62]

In response to this flurry of activity, the Court held a hearing where it set a sequence of three trials to decide the series of recent disputes: (1) a trial on the Motion to Dismiss and Response; (2) a trial on Debtor's Claim Objection, Temporary Allowance Motion, and the Motion to Designate, and oppositions; and (3) a trial on confirmation of the Fourth Plan.[63]

On August 3, 2026, the Debtor and Male Excel submitted their "Stipulated Facts and Exhibits for Hearing on Motion to Dismiss" (the "Stipulated Facts.").[64] Therein, the Debtor and Male Excel stipulated to 76 facts. The Court has accepted and effectively admitted into evidence all the Stipulated Facts. (However, as set forth below, the Court has only admitted into evidence the specific exhibits used at the trial.)

On August 10 and 11, 2026, the Court conducted the first trial in the sequence, on the Motion to Dismiss and Response. During the trial, the Court received the testimony of two witnesses: Jeffrey Fell (the Debtor's Chief Executive Officer) and Josh Predolich (the Debtor's primary external accountant). The Court admitted Male Excel's Exhibits AH-BG, BI, BJ, BK, plus the Debtor's Exhibits 1, 3, 4, 28, 29, 31, 33, 39-43, and 45-56.[65] Male Excel and the Debtor presented comprehensive closing arguments under Section 1112(b)(1). At the conclusion of the trial, the Court took the Motion to Dismiss and Response under advisement.

## IV. **<u>Factual Findings</u>**.

The Court makes the following factual findings under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052 and 9104(c), based upon the testimony of the witnesses and the exhibits admitted at the trial and the Stipulated Facts. To the extent that the Court's identification of the foregoing Procedural Background is factual in nature, the Court also incorporates the foregoing Procedural Background as part of the Court's factual findings. The Stipulated Facts mainly mirror the Procedural Background.

### A. **<u>The Debtor's Formation and First Bankruptcy Case</u>**.

The Debtor is a Colorado corporation formed in 2010 by its Chief Executive Officer, Jeffrey Fell, as a sales, marketing and third-party customer service company. At its height, the Debtor owned five call centers throughout the United States. Alfred

---

59 Second Bankruptcy Case Docket No. 387.
60 Second Bankruptcy Case Docket No. 387.
61 Second Bankruptcy Case Docket No. 366.
62 Second Bankruptcy Case Docket No. 376.
63 Second Bankruptcy Case Docket No. 395; Ex. 4.
64 Second Bankruptcy Case Docket No. 415
65 Second Bankruptcy Case Docket No. 416.

Trexler serves as the Debtor's Chief Operating Officer. As previously detailed, Mr. Fell and Mr. Trexler own the Debtor through their ownership of its direct parents, Sulit Group Ltd. and Vero Investment Co.

However, the Debtor's fortunes started to decline as customers began moving their accounts to cheaper overseas call centers. To address this decline, the Debtor decided to pivot. In 2020, the Debtor purchased Public Interest Communications ("PIC"), a company exclusively focused on political fundraising and providing call center services to non-profit organizations. Many of PIC's clients stayed with the Debtor after the purchase, and include several well-known nonprofits, such as the ACLU, Amnesty International, Human Rights Watch, Doctors Without Borders, and the World Wildlife Fund. However, the contract with PIC's largest client expired shortly after the Debtor purchased PIC, leading to immediate financial difficulties.

One of the Debtor's customers was Male Excel, an online purveyor of generic erectile dysfunction drugs. Male Excel was owned by a longtime friend of Mr. Trexler. However, their business relationship soon soured and on May 1, 2020, Male Excel tried to terminate the business relationship. Litigation ensued and Male Excel successfully obtained the Judgment issued in the Nevada State Action, giving rise to the protracted set of disputes detailed above.

By virtue of their ownership interests and positions, Messrs. Fell and Trexler control all the Debtor's business activities and financial decisions. They also direct its legal and litigation strategy, including the decisions to file for bankruptcy, file and withdraw various Chapter 11 Plans, propose and litigate the Settlement Agreement, commence the Adversary Proceeding and Federal Court Action, and pursue the related appeals.

On September 27, 2023, Debtor filed for bankruptcy protection in the First Bankruptcy Case primarily to halt execution on the Judgment and to avoid posting a supersedeas bond while the Debtor appealed the Judgment to the Nevada Supreme Court. Mr. Fell testified he neither investigated nor attempted to obtain a supersedeas bond, as he thought that the Debtor lacked enough assets to post one. He did consult with the Debtor's lawyers on the topic; but did nothing further. During the First Bankruptcy Case, the Debtor cut costs by shutting down two of its call centers and rejecting a lease.

## B. <u>The Debtor's Second Bankruptcy Case and Post-Petition Operations</u>.

After the dismissal of the First Bankruptcy Case, on June 20, 2024 (the "Petition Date"), the Debtor filed again for bankruptcy protection under Chapter 11 Subchapter V in the Second Bankruptcy Case. The Debtor soon withdrew its Subchapter V election. Promptly after the commencement of the Second Bankruptcy Case, Male Excel filed Proof of Claim No. 4 asserting a general unsecured claim against the Debtor based on the Judgment in the amount of $4,469,565.48 to $5,376,730.63. Male Excel is the

largest general unsecured creditor of the Debtor and holds approximately 94% of the Debtor's non-priority, non-insider unsecured debt.

Besides the Male Excel claim, the other non-insider substantial unsecured debt is owed to Harvest Small Business Finance, LLC ("Harvest"). This debt is based on two loans. First, the Debtor guaranteed a 2017 loan obtained by JAFT Ventures for the purchase of real property.[66] The petition date balance of this loan was $2,811,421.92. Second, the Debtor is a co-obligor on a second 2017 loan obtained by JAFT Ventures for the purchase of real property. The petition date balance of this loan was $747,910.78.[67] Historically, JAFT Ventures has made all payments on the two loans.

The law firm Holland & Hart LLP was also listed as having an unsecured claim of $192,656.76 for Attorneys' Fees.[68] Holland & Hart LLP has not filed a Proof of Claim during the Second Bankruptcy Case. Holland & Hart LLP's only attempt to collect on its claim was sending a collection letter to the Debtor. And the Debtor also has one secured creditor, the U.S. Small Business Administration, to whom it owes $133,762.[69]

As of the Petition Date, the Debtor had $49,380 in cash and 119 employees.[70] During the Second Bankruptcy Case, as with the First Bankruptcy Case, the Debtor cut costs. The Debtor terminated Gene Speyer, the Vice President of Operations, and left his position unfilled, thereby saving most of his $200,000 annual salary. In addition, the Debtor closed the rest of its physical call centers. All its employees now work remotely. According to the Debtor's most recent Monthly Operating Report, the Debtor currently has 87 employees.[71]

During the Second Bankruptcy Case, the Debtor has (unsurprisingly) incurred significant attorney fees. With respect to its primary bankruptcy counsel, Wadsworth Garber Warner Conrardy, P.C., the Debtor has incurred $161,674 in fees, of which it has paid $25,387.[72] The Debtor has incurred $428,603 in fees for its special counsel in Nevada, Brownstein Hyatt Farber Schreck LLP, which it has paid.[73]

Operationally, the Debtor's Monthly Operating Reports (admitted as Exhibits AH-BG) show the following economic results during the Second Bankruptcy Case (as summarized in Exhibit BI):

---

66 Ex. 1 at 19.
67 *Id*. at 20.
68 *Id*.
69 *Id.* at 14.
70 Ex. AH at 3.
71 Second Bankruptcy Case Docket No. 429.
72 *Id.* at 3.
73 *Id.* at 5.

**Monthly Operating Report Summary Exhibit**
***In re Signia Ltd.*, Case No. 24-13438-TBM**
**Hearing on Male Excel Medical, P.A.'s and Male Excel, Inc's Motion to Dismiss Bankruptcy Case**

| DOCKET NUMBER | MONTH | GROSS INCOME | MONTHLY PROFIT/LOSS | CUMULATIVE P/L | CASH BALANCE |
|---|---|---|---|---|---|
| 104 | June/July 2024 | $329,013.63 | ($39,184.18) | ($39,184.18) | $22,678.10 |
| 115 | Aug-24 | $210,908.64 | ($11,714.31) | *Not Provided* | $21,848.53 |
| 176 | Sep-24 | $264,548.00 | $12,384.00 | ($63,282.00) | $53,478.00 |
| 177 | Oct-24 | $284,159.00 | ($11,349.00) | ($74,631.00) | $9,795.00 |
| 178 | Nov-24 | $205,574.00 | ($88,821.00) | ($163,451.00) | $19,167.00 |
| 192 | Dec-24 | $213,052.00 | $24,838.00 | ($138,613.00) | $63,937.00 |
| 208 | Jan-25 | $107,538.00 | ($32,205.00) | ($170,818.00) | $20,527.00 |
| 250 | Feb-25 | $134,090.00 | ($20,838.00) | ($191,656.00) | $11,109.00 |
| 266 | Mar-25 | $199,394.00 | $49,511.00 | ($142,144.00) | $59,355.00 |
| 292 | Apr-25 | $221,916.00 | $55,909.00 | ($86,235.00) | $113,345.00 |
| 304 | May-25 | $223,164.00 | $49,391.00 | ($36,844.00) | $167,037.00 |
| 309 | Jun-25 | $172,558.00 | ($21,355.00) | ($58,199.00) | $181,941.00 |
| 317 | Jul-25[1] | $189,873.00 | $29,330.00 | ($28,869.00) | $183,644.00 |
| 325 | Aug-25 | $140,630.00 | $4,878.00 | ($23,991.00) | $189,441.00 |
| 330 | Sep-25 | $167,059.00 | ($93,129.00) | ($117,120.00) | $93,927.00 |
| 333 | Oct-25 | $144,425.00 | ($153,700.00) | ($270,820.00) | $16,532.00 |
| 343 | Nov-25 | $154,287.00 | $12,880.00 | ($257,940.00) | $34,051.00 |
| 353 | Dec-25 | $197,151.00 | $76,351.00 | ($181,590.00) | $111,376.00 |
| 360 | Jan-26 | $117,886.00 | $3,899.00 | ($177,691.00) | $118,096.00 |
| 365 | Feb-26 | $131,265.00 | $1,578.00 | ($176,113.00) | $116,759.00 |
| 375 | Mar-26 | $149,269.00 | ($45,358.00) | ($221,471.00) | $106,040.00 |
| 394 | Apr-26 | $199,844.00 | ($16,354.00) | ($237,824.00) | $62,472.00 |
| 399 | May-26 | $127,680.00 | ($46,824.00) | ($284,648.00) | $12,313.00 |
| 404 | Jun-26 | $261,965.00 | $75,604.00 | ($209,044.00) | $88,793.00 |

The Debtor's results have been a little better during the last couple months. The Debtor's most recent Monthly Operating Reports[74] show:

| Docket No. | Month | Gross Income | Monthly Profit/Loss | Cumulative P/L | Cash Balance |
|---|---|---|---|---|---|
| | | | | | |
| 427 | July 2026 | $269,734 | $92,651 | ($116,393) | $190,415 |
| 429 | Aug. 2026 | $271,717 | $95,267 | ($21,126) | $284,546 |

So, from a strictly cash perspective, the Debtor started the Second Bankruptcy Case with $49,380 and now has $284,546. The Debtor is current on its United States Trustee fees, insurance, and taxes.[75] Some of this positive news is likely attributable to the cyclical nature of the Debtor's business. As Mr. Predolich testified, political work follows election cycles, making 2026 a particularly strong year for the Debtor. Notwithstanding this positive picture, the Debtor's most recent Monthly Operating Report also shows that the Debtor has accumulated $242,903 in unpaid post-petition payables, which is close to the Debtor's cash on hand.

## C. <u>The Debtor's Chapter 11 Plans</u>.

---

74 Second Bankruptcy Case Docket Nos. 427 and 429.
75 Second Bankruptcy Case Docket No. 429.

During the the pendency of the Second Bankruptcy Case the Debtor has proposed five Chapter 11 plans of reorganization. To date, none have been confirmed.

However, there has been some progress. In response to objections from Male Excel, the United States Trustee, and Harvest to the Disclosure Statement for the Second Amended Plan of Reorganization, the Debtor withdrew the Disclosure Statement and agreed to file a new Disclosure Statement that was responsive to their concerns.[76] The Debtor's next Disclosure Statement only garnered an objection from Male Excel.[77] In the Debtor's Second Amended Plan of Reorganization, Messrs. Fell and Trexler agreed to personally guarantee distributions of up to $1,000,000 to Male Excel.[78] In response to Male Excel's concerns about the Second Amended Plan, the Debtor's counsel engaged with Male Excel's counsel, who provided redlines.[79] The Debtor accepted, in substance, most of Male Excel's suggested changes in the Third Amended Plan of Reorganization.[80] The primary change that was not included in the Third Amended Plan of Reorganization was Male Excel's request that the Debtor agree to a stipulated judgment to Male Excel's claim. However, Mr. Fell later testified that the Debtor would agree to a stipulated judgment.

The changes to the Third Amended Plan of Reorganization included the addition of language that provided that "the discharge will not void or otherwise impact Male Excel's judgment or any claims Male Excel has" and that "[t]he Guarantors [Messrs. Fell and Trexler] shall each execute an absolute, irrevocable, unconditional, and continuing payment guaranty in favor of the Holders of Allowed Class 3 Claims, guaranteeing that the aggregate Net Profit Fund will receive not less than $1,000,000. The Guarantors shall be jointly and severally liable for the guaranteed amount." The Debtor withdrew the Disclosure Statement due to Male Excel's objections.[81]

The Debtor then submitted the Fourth Amended Plan of Reorganization (the "Fourth Plan") which included new language that provided that "[a]lthough Male Excel's claim is Contested, Male Excel shall share in the Pro Rata distributions provided herein to Class 3 claimants."[82] It also provided that the insider claims "of Sulit Group, Ltd, National Research and Polling Group, Ltd., JAFT, Vero Investment Company, Alfred Trexler and DialCloud LLC" would only be paid if Male Excel's claim is "paid in full."[83]

Male Excel voted against the Fourth Plan.[84] Harvest, the sole member of Class 2, agreed to vote for the Fourth Plan[85] despite "receive[ing] no payments under the Plan

---

76 Second Bankruptcy Case Docket No. 331.
77 Second Bankruptcy Case Docket No. 363.
78 Ex. 48 at 11.
79 Exs. 54 and 52.
80 *See* Ex. 50.
81 Second Bankruptcy Case Docket No. 363.
82 Exs. 3 and 53 at 9.
83 *Ex. 53* at 10.
84 Ex. 28.
85 *Id*.

unless JAFT defaults on its payment obligations."[86] Mr. Fell testified (without any contrary evidence) that the liquidation value of the Debtor is $77,969.[87] He contends that the Fourth Plan is confirmable and will present a more favorable outcome than Chapter 7 liquidation.

## V. Legal Analysis.

### A. General Legal Framework for Dismissal under Section 1112(b).

The Motion to Dismiss is based on Section 1112(b). Section 1112(b) provides for dismissal or conversion of a bankruptcy case for "cause." As amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, ("BAPCPA"), Section 1112(b)(1) now states:

> [O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

Section 1112(b)(1) was substantially amended by BAPCPA to eliminate some of the Court's discretion and make dismissal or conversion presumptively mandatory if cause is demonstrated.[88]

---

86 Second Bankruptcy Case Docket No. 367 at 8.

87 Ex. 4 at Ex. C.

88 There is a narrow exception to presumptive dismissal or conversion if cause is shown. Section 1112(b)(2) states:

> The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that —
>
> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
>
> (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A) —
>
> (i) for which there exists a reasonable justification for the act or omission; and
>
> (ii) that will be cured within a reasonable period of time fixed by the court.

Based on the statutory text, dismissal or conversion of a Chapter 11 case under 1112(b)(1) is a two-step process:

> First, the Court must determine whether 'cause' exists for dismissal or conversion of the [C]hapter 11 case. Next, the Court must determine whether dismissal or conversion of the case is in the best interests of the creditors and the estate.

*In re OptInRealBig.com LLC*, 345 B.R. 277, 282 (Bankr. D. Colo. 2006).

**1. Cause.**

Typically, the main fight under Section 1112(b)(1) is whether cause can be demonstrated. Section 1112(b)(4) lists sixteen illustrative examples of cause for conversion or dismissal. More specifically, the statute states "the term 'cause' includes" and then identifies examples. These statutory examples are sometimes referred to as "enumerated causes." However, while the statute lists sixteen enumerated causes for dismissal or conversion, the listing is not exclusive or restrictive. *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989) (stating that the Section 1112(b) list "is not exhaustive"). The Court may dismiss or convert for causes other than the enumerated causes because Section 1112(b)(1) is flexible and gives the Court broad discretion to determine whether cause for dismissal or conversion exists. *In re Autterson*, 547 B.R. 372, 409 (Bankr. D. Colo. 2016); *In re Pac. Rim Invs., LLP*, 243 B.R. 768, 772 (Bankr. D. Colo. 2000). But again, if cause is demonstrated, then dismissal or conversion is presumptively mandatory.

The most frequently-asserted non-enumerated cause for Section 1112(b) dismissal or conversion is lack of good faith. Good faith is a central requirement for the entire Chapter 11 reorganization exercise. The requirement of "good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes." *Little Creek Dev. Co. v. Commonwealth Mort. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986).

Every Circuit Court of Appeals that has considered the question has decided that lack of good faith — even though unenumerated in Section 1112(b)(4) — is grounds for dismissal or conversion. *See LTL Mgmt., LLC v. Those Parties Listed on Appendix A (In re LTL Mgmt., LLC)*, 64 F.4th 84, 100 (3d Cir. 2023) ("Chapter 11 bankruptcy petitions are 'subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith.'"); *In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir. 1999) ("[T]he courts of

---

The Debtor has not argued that Section 1112(b)(2) "unusual circumstances" apply and has not identified any such "unusual circumstances." Accordingly, the "unusual circumstances" exception under Section 1112(b)(2) does not apply.

appeals that have considered the issue have held that the absence of good faith constitutes 'cause' to dismiss a Chapter 11 petition under § 1112(b)."); *Trident Assocs. Ltd. P'ship v. Metro. Life Ins. Co. (In re Trident Assocs. Ltd. Partnership)*, 52 F.3d 127, 130 (6th Cir. 1995) (holding that "debtor bad faith can constitute cause" under Section 1112(b)); *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994) ("Although section 1112(b) does not explicitly require that cases be filed in 'good faith,' courts have overwhelmingly held that a lack of good faith in filing a Chapter 11 petition establishes cause for dismissal."); *Humble Place Joint Venture v. Fory (In re Humble Place Joint Venture)*, 936 F.2d 814, 816-17 (5th Cir. 1991) (noting that a debtor's lack of good faith in filing constitutes cause under Section 1112(b) and citing *Little Creek*, 779 F.2d at 1072).

In this jurisdiction, lack of good faith has been accepted as a cause justifying dismissal or conversion under Section 1112(b) for many years. *Bird v. Dahlstrom (In re Dahlstrom)*, 963 F.2d 382, 1992 WL 112238, at *2 (10th Cir. May 22, 1992) (unpublished) ("We also recognize that lack of good faith may constitute 'cause' under § 1112(b)."); *Winslow v. Williams Group (In re Winslow)*, 949 F.2d 401, 1991 WL 261696, at *2 (10th Cir. Dec. 6 1991) (unpublished) ("[B]ankruptcy courts may convert cases under § 1112(b) when a debtor engages in bad faith conduct."); *Muth v. Muth (In re Muth)*, 514 B.R. 719, 2014 WL 1712527, at *5 (10th Cir. BAP May 1, 2014) (unpublished) ("'Although a debtor's bad faith in filing a petition is not an enumerated ground for dismissal under § 1112(b), courts have overwhelmingly held that proof of such an allegation may be 'cause' for dismissal.'") (citation omitted); *Pac. Rim Inves.*, 243 B.R. at 771 ("It is well established under the Bankruptcy Code, as it was under the Bankruptcy Act, that a Chapter 11 petition must be filed in good faith, and if not, dismissal of the case is an appropriate remedy."). Other more recent Colorado decisions confirming lack of good faith as a basis for dismissal under Section 1112(b) include: *In re Platte River Bottom*, 2016 WL 241464, at *6 (Bankr. D. Colo. Jan. 20, 2016); and *In re eFusion Servs., LLC*, 2014 WL 5293415, at *2 (Bankr. D. Colo. Oct. 16, 2014). In the Motion to Dismiss and Response, Male Excel and the Debtor have both agreed that lack of good faith may serve as a legal basis for dismissal or conversion under Section 1112(b). The Court concurs.

But, that leads to the next question: How should the Court determine whether the Debtor has engaged in lack of good faith sufficient to mandate dismissal or conversion under Section 1112(b)? The answer is an assessment of the totality of the circumstances. *See In re 15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009) (Section 1112(b) standard to establish good faith or lack thereof is the "totality of facts and circumstances"); *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004) ("Whether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine 'the totality of the facts and circumstances . . . .'"); *Platte River,* 2016 WL 241464, at *4 ("Courts always evaluate the totality of the circumstances to determine if cause exists to dismiss or convert a chapter 11 case under § 1112(b)."); *eFusion Servs.*, 2014 WL 5293415, at *2 (noting applicability of totality standard). This means that "courts, in general, consider any factors which indicate that a petition was

filed to abuse the purposes of the Bankruptcy Code, or to delay or frustrate the legitimate efforts of creditors to enforce their rights." *Winslow*, 1991 WL 261696, at *2. The totality of the circumstances standard is a broad framework; but is necessary in the Section 1112(b) context. Bankruptcy Judge Tallman explained why:

> Chapter 11 cases vary widely and do not lend themselves to a cookie cutter approach to analyzing bad faith of a bankruptcy filing. As a consequence, bad faith, in the context of a Chapter 11 filing as in most other bankruptcy contexts, is always determined on a case by case basis.

*In re Springs Hosp., Inc.*, 2006 WL 2458679, at *3 (Bankr. D. Colo. Aug. 22, 2006).

To facilitate an assessment of the totality of the circumstances under Section 1112(b), courts have identified a myriad of potentially relevant factors which may be considered depending on the case. Among the "numerous indicia that constitute classic badges of bad faith filing," the Tenth Circuit noted the following:

> [The Debtor] (1) has only one asset; (2) has only one creditor; (3) acquired property which was posted for foreclosure and the prior owners had been unsuccessful in defending against the foreclosure; (4) was revitalized on the eve of foreclosure to acquire the insolvent property; (5) has no ongoing business or employees; (6) lacks a reasonable possibility of reorganization; and (7) the Chapter 11 filing stopped the foreclosure.

*Udall v. F.D.I.C. (In re Nursery Land Dev., Inc.)*, 91 F.3d 1414, 1416 (10th Cir. 1996) (citations omitted). Courts have identified other factors such as: (1) the debtor has no employees; (2) the debtor has little or no cash flow; (3) there are no available sources of income to sustain a plan; (4) the debtor does not intend to rehabilitate; (5) there are few, if any, unsecured creditors; and (6) the debtor and a creditor have proceeded to a stand-still in state court litigation. *Platte River*, 2016 WL 241464, at *9 and*11; *Springs Hosp.*, 2006 WL 2458679, at *3.

Overall, the Court needs to step back and consider whether "the totality of the circumstances, paints a factual picture leading to the inescapable conclusion that use of the bankruptcy laws by the debtor is inappropriate." *eFusion Servs.*, 2014 WL 5293415, at *2. At that fundamental level, two other inquires may be particularly important on the issue of good faith: "(1) whether the petition serves a valid bankruptcy purpose; and (2) whether [it] is filed merely to obtain a tactical litigation advantage." *BEPCO*, 589 F.3d at 618. *See also Integrated Telecom*, 384 F.3d at 120 (citing *SGL Carbon*, 200 F.3d at 165); *LTL Mgmt.*, 64 F.4th at 100-01 (citing *Integrated Telecom*). With respect to bankruptcy purpose, "a debtor who does not suffer from financial distress cannot demonstrate its Chapter 11 petition serves a valid bankruptcy purpose supporting good faith." *LTL Mgmt.*, 64 F.4th at 101. And, regarding litigation advantage, where "the

primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith." *SGL Carbon*, 200 F.3d at 165.

Generally, the movant asserting a Section 1112(b) motion bears the burden of proof to show cause for dismissal or conversion by a preponderance of the evidence. *In re Whetten*, 473 B.R. 380, 382 (Bankr. D. Colo. 2012). Both Male Excel and the Debtor agree that the initial burden of proof is on Male Excel. However, with respect to good faith, "[o]nce at issue, the burden to establish good faith is on the debtor." *LTL Mgmt.,* 64 F.4th at 100. *See also SGL Carbon*, 200 F.3d at 162 n.10 ("Once at issue, the burden falls upon the bankruptcy petitioner to establish that the petition has been filed in 'good faith.'"); *Integrated Telecom*, 384 F.3d at 118 ("the burden is on the bankruptcy petitioner to establish that its petition was filed in good faith" (citing *SGL Carbon*)); *In re Fox*, 232 B.R. 229, 233 (Bankr. Kan. 1999) ("As a general rule, the movant bears the burden of proving by a preponderance of the evidence that cause exists for dismissal of a debtor's bankruptcy case. However, when lack of good faith is raised as a basis for dismissal for cause [under Section 1112(b)], the debtor bears the ultimate burden of proving that the filing was made in good faith.") (citations omitted).

**2. <u>Dismissal v. Conversion</u>.**

If cause is proved, the Court must select as between dismissal or conversion based upon the "best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1). Notably, the statutory language does not refer to a debtor's best interests. The case law construing Section 1112(b)(1) universally indicates that the Debtor's interest is irrelevant. For example, in *In re Sullivan*, 626 B.R. 326, 335 (Bankr. D. Colo. 2021), Bankruptcy Judge Brown observed that "the statute instructs the Court to weigh the best interests of the creditors and the estate, not the Debtor . . . and . . . the Court is not required to consider the debtor's best interest . . . ." *Id.* at 335. *See also In re Helmers*, 361 B.R. 190, 197 (Bankr. D. Kan. 2007) ("What happens to the debtors is not really relevant.").

There is "no 'bright-line test to determine [whether] conversion or dismissal is in the best interests of creditors and the estate.'" *In re DB Cap. Holdings, LLC*, 2011 WL 5520439, at *3 (Bankr. D. Colo. Nov. 11, 2011) (quoting *In re Westhampton Coachworks, Ltd.*, 2010 WL 5348422, at *6 (Bankr. E.D.N.Y. Dec. 21, 2010)) (brackets in *DB Cap.*). Instead,

> [T]he decision whether to convert to Chapter 7 or to dismiss is committed to the discretion of the bankruptcy court. The standard for choosing conversion or dismissal based on "the best interest of creditors and the estate" implies a balancing test to be applied through case-by-case analysis. The element of the best interest of creditors requires the Court to consider which alternative would be most advantageous to the parties. The element of the best interest of the estate

> focuses upon whether the economic value of the estate is greater inside or outside of bankruptcy.

*In re Gateway Ethanol, LLC*, 2011 WL 597059, at *2 (Bankr. D. Kan. Feb. 11, 2011) (internal citations omitted). Per the Tenth Circuit, "a bankruptcy court has broad discretion to convert a Chapter 11 case to a Chapter 7 proceeding or to dismiss a case" under Section 1112(b)(1). *Small Bus. Admin. v. Preferred Door Co., Inc. (In re Preferred Door Co, Inc.)*, 990 F.2d 547, 549 (10th Cir. 1993).

### B. **Application of the Law and the Facts: Male Excel Did Not Establish Cause for Conversion or Dismissal under Section 1112(b)(1).**

In the Motion to Dismiss, Male Excel advances a smorgasbord of enumerated and unenumerated alleged "causes" under Section 1112(b)(1) for dismissal of the Second Bankruptcy Case. It's main position (which is unenumerated in Section 1112(b)(4)) is that the Second Bankruptcy Case "was filed in bad faith as a litigation tactic to collaterally attack Male Excel's Judgment." Then, Male Excel adds a few other arguments: (1) the Debtor has suffered "substantial or continuing losses, diminution of the estate, and inability to reorganize" under Section 1112(b)(4)(A); (2) the Debtor is administratively insolvent; (3) the Debtor's Fourth Plan "demonstrates bad faith creditor class 'gerrymandering.'"

#### 1. **Male Excel Did Not Establish Bad Faith Filing as a Cause for Dismissal.**

In addition to its general mantra of "bad faith," Male Excel has presented a series of related sub-arguments:

- "The Second Bankruptcy Case is a two-party dispute"
- "The Settlement Motion was a bad faith attempt to collaterally attack Male Excel and shield the Debtor's insiders and owners in the USDC Action"
- "The Debtor's multiple objections to Male Excel's Claim and its Motion to Designate Male Excel's Claim were submitted in bad faith"
- The "Second Bankruptcy Case is a bad faith filing to avoid funding a super[s]edeas bond on the pending appeals in the Nevada Action"

And, there are sub-sub arguments too.

The Court agrees with Male Excel that (if proven) bad faith may constitute an unenumerated ground for cause and a basis for dismissal of the Second Bankruptcy Case under Section 1112(b)(1). *See LTL Mgmt. LLC,* 64 F.4th at 100; *SGL Carbon Corp.*, 200 F.3d at 160 (3d Cir. 1999); *Dahlstrom*, 963 F.2d 382; *Winslow*, 949 F.2d 401; *Muth*, 514 B.R. 719. The Debtor does not suggest otherwise.

In assessing whether the Debtor has engaged in lack of good faith sufficient to mandate dismissal or conversion under Section 1112(b), the Court must consider the totality of the circumstances. *BEPCO, L.P.*, 589 F.3d at 618; *NMSBPCSLDHB, L.P.*, 384 F.3d at 118; *Platte River,* 2016 WL 241464, at *4. Toward that end, courts have identified a series of relevant factors for good faith analysis. The seminal decision in the Tenth Circuit Court of Appeals, *Nursery Land Development,* 91 F.3d at 1416 identified seven "classic badges of bad faith filing":

> [The Debtor] (1) has only one asset; (2) has only one creditor; (3) acquired property which was posted for foreclosure and the prior owners had been unsuccessful in defending against the foreclosure; (4) was revitalized on the eve of foreclosure to acquire the insolvent property; (5) has no ongoing business or employees; (6) lacks a reasonable possibility of reorganization; and (7) the Chapter 11 filing stopped the foreclosure.

*Id.*

The foregoing factors generally counsel against dismissal or conversion of the Second Bankruptcy Case. *First*, the Debtor does not have "only one asset." To the contrary, the Debtor has: bank accounts; accounts receivable; furniture and fixtures; technology equipment; and causes of action.[89] Unlike many bad faith scenarios, the Debtor does not own a single piece of fully-encumbered real estate. *Second*, the Debtor does not have "only one creditor." Instead, in the Debtor's Schedule D and E/F, the Debtor identified: one secured creditor; seven priority unsecured creditors; and thirty-one general unsecured creditors.[90] Furthermore, thirteen creditors filed proofs of claim.[91] *See Signia, Ltd.*, 2025 WL 2694029, at *6-8 (listing creditors). It is true that Male Excel's Claim constitutes "94% of all non-insider, non-priority unsecured claims." *Id*. at *22. But, again, the Debtor most assuredly does not have "only one creditor." *Third*, the Debtor did not "acquire[] property which was posted for foreclosure and the prior owners had been unsuccessful in defending against the foreclosure." *Fourth,* the Debtor was not "revitalized on the eve of foreclosure to acquire the insolvent property." *Fifth,* the Debtor has ongoing business and a large number of employees. The Debtor does not match the typical bad faith situation in which the Debtor has "no ongoing business or employees." *Sixth*, the Debtor filed the Fourth Plan. A trial on confirmation of the Fourth Plan is scheduled and as such there is a "possibility of reorganization." And, *seventh,* the Chapter 11 filing did not stop a foreclosure. So, none of the *Nursery Land Development* factors support dismissal or conversion under Section 1112(b)(1).

Courts have identified other factors such as: (1) the debtor has no employees; (2) the debtor has little or no cash flow; (3) there are no available sources of income to sustain a plan; (4) the debtor does not intend to rehabilitate; (5) there are few, if any,

---

89 *See* Ex. 1.

90 *Id*.

91 Exs. 29, 30, 31, 33, and 39-41.

unsecured creditors; and (6) the debtor and a creditor have proceeded to a stand-still in state court litigation. *Platte River*, 2016 WL 241464, at *9 and *11; *Springs Hosp.*, 2006 WL 2458679, at *3. There is some overlap, but again, these additional factors do not support dismissal or conversion either. *First*, the Debtor has a large number of employees. The Debtor started the Second Bankruptcy Case with 119 employees, of which 99 were full-time.[92] As of August 31, 2026, the Debtor retained 87 full-time employees.[93] *Second,* unlike many bad-faith scenarios, the Debtor is a real business with employees and cash flow. The Debtor's most recent Monthly Operating Reports show:

| Docket No. | Month | Gross Income | Monthly Profit/Loss | Cumulative P/L | Cash Balance |
|---|---|---|---|---|---|
| | | | | | |
| 427 | July 2026 | $269,734 | $92,651 | ($116,393) | $190,415 |
| 429 | Aug. 2026 | $271,717 | $95,267 | ($21,126) | $284,546 |

The evidence at trial from Mr. Fell was that the Debtor is returning to profitability. *Third*, there are available sources of income to sustain a plan. Mr. Fell testified in support of the Debtor's projections supporting the Fourth Plan. *Fourth,* the debtor does intend to rehabilitate. By "rehabilitate," the Court means to reorganize and stay in business. That is the Debtor's intention as stated in the Fourth Plan. *Fifth,* there are more than just a few unsecured creditors. In fact, most of the Debtor's debt is unsecured. In the Debtor's Schedules D and E/F, the Debtor identified: one secured creditor; seven priority unsecured creditors; and thirty-one general unsecured creditors.[94] Furthermore, thirteen creditors filed proofs of claim.[95] *Sixth,* the Debtor and Male Excel have not "proceeded to a stand-still in state court litigation." The Judgment was entered in the Nevada State Action. The Judgment is on appeal to the Nevada Supreme Court. Accordingly, none of the *Platte River* factors support dismissal or conversion under Section 1112(b)(1).

Although Male Excel largely avoided analyzing each of the *Nursery Land Development* and *Platte River* factors which are often used to support dismissal or conversion, Male Excel separately argued: "the Second Bankruptcy Case is a two-party dispute." Again, the Court does not concur. It is true that the Judgment forced the Debtor into bankruptcy and that Male Excel holds the lion's share — approximately 94% — of all non-insider, non-priority unsecured claims. But there are secured and priority unsecured creditors, plus a significant number of general unsecured creditors, plus insider claims too.

Next, Male Excel contended that the "Settlement Motion was a bad faith attempt to collaterally attack Male Excel and shield the Debtor's insiders and owners in the USDC Action." As set forth above, the Settlement Motion was hotly contested. The

---

92 Ex. 5 at 3.

93 Second Bankruptcy Case Docket No. 429 at 1.

94 Ex. 1.

95 Exs. 29, 30, 31, 33, and 39-41.

Court conducted a trial on the Settlement Motion and Male Excel's objections. Following trial, the Court issued an Opinion denying the Settlement Agreement primarily on the grounds that it was not "a fair and equitable settlement for the benefit of the Debtor's non-insider general unsecured creditors."[96] *Signia, Ltd.*, 2025 WL 2694029, at *19. The Court did not determine that the Settlement Motion was presented in bad faith. Whilst the Court concludes that the Settlement Motion was ill-conceived and did not satisfy the requirements for approval under Fed. R. Bankr. P. 9019 and *Protective Comm. For Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968), the Court does not believe that losing a motion (under the circumstances of the Settlement Motion) is sufficient to prove cause for dismissal or conversion under Section 1112(b)(1). Furthermore, the Settlement Motion did not collaterally attack Male Excel and the Judgment.

Next, Male Excel argued that the Debtor's "multiple objections to Male Excel's Claim and its Motion to Designate Male Excel's Claim were submitted in bad faith." The Court received almost no evidence on the point except the pleadings. In any event, the Court has set a trial on the Debtor's Claim Objection, Temporary Allowance Motion, Motion to Designate and all related objections for October 26, 2026.[97] As a matter of judicial discretion, the Court assesses that it would be best to allow the parties to present evidence at the upcoming trial rather than making a spur of the moment decision on bad faith about various pleadings that have not been finally adjudicated.

Finally, regarding bad faith, Male Excel contended that the "Second Bankruptcy Case is a bad faith filing to avoid funding a super[s]edeas bond on the pending appeals in the Nevada Action." The scenario presented in this Second Bankruptcy Case is not novel. Judgment debtors who lose in state court and wish to appeal without posting security under state law (because they cannot or will not) frequently file for bankruptcy protection to invoke the Section 362(d) automatic stay. And, then, judgment creditors often file a Section 1112(b) motion to dismiss or convert for alleged bad faith — just like in this case. The Court acknowledges that "[c]ourts are split on the issue of whether a bankruptcy filing is in bad faith because it was done to circumvent the statutory requirements of posting a supersedeas bond." *Hillside Plaza, Ltd. v. Pomodoro Rest. (In re Pomodoro Rest.)*, 251 B.R. 441, 1999 WL 282735 at *3 n.5 (10th Cir. BAP May 3, 1999) (unpublished) (listing cases on both sides). *See also In re Hyatt*, 479 B.R. 880, 893-95 (Bankr. N.M. 2012) (same); *Fox*, 232 B.R. at 233 n.4 and n.5 (same); *In re Boynton*, 184 B.R. 580, 582 (Bankr. S.D. Cal. 1995) (same); *In re Davis*, 93 B.R. 501, 503 (Bankr. S.D. Tex. 1987) (same).

But there is a way to rationalize the seemingly disparate results. As the *Boynton* court astutely observed:

> The cases granting dismissal on bad faith grounds . . . dealt with smaller judgments where the debtor had the ability to satisfy the judgment without losing the ability to stay in

96 Second Bankruptcy Case Docket No. 312 at 31.
97 Second Bankruptcy Case Docket No. 395 at 3.

> business. The cases denying the motion to dismiss typically involved larger judgments that would render the debtor unable to continue in business and allowed the judgment creditor only a partial recovery.

*Boynton,* 184 B.R at 582 (dismissing bankruptcy case for bad faith). Similarly, in *Davis*, the court noted: "One primary characteristic of those cases not finding bad faith is that the judgment together with the debtor's other liabilities substantially exceeded the assets." *Davis*, 93 B.R. at 503. The Tenth Circuit Bankruptcy Appellate Panel endorsed the distinctions made by the *Boynton* and *Davis* courts. *Pomodoro Rest.*, 1999 WL 282735, at *3.

So financial capacity matters a great deal. Bankruptcy might be appropriate even to avoid state law requirements for posting an appellate bond if the debtor is insolvent and a distribution plan is required to split the debtor's insufficient resources. That is the Second Bankruptcy Case. The Judgment far exceeds the Debtor's ability to pay. Per the unrebutted testimony of Mr. Fell, the liquidation value of the Debtor's assets is only $77,969. Plainly, the Debtor is grossly insolvent. So, filing for bankruptcy protection (even to avoid payment of a supersedeas bond) is not *per se* bad faith in the sense of the Section 1112(b)(1) cause.

Having assessed all the bad faith factors and arguments, the Court needs to step back and consider whether "the totality of the circumstances, paints a factual picture leading to the inescapable conclusion that use of the bankruptcy laws by the debtor is inappropriate." *eFusion Servs.*, 2014 WL 5293415, at *2. At that fundamental level, the Court cannot conclude, based on the evidence at the trial, that the Debtor's use of the bankruptcy process is conclusively inappropriate.

**2. <u>Male Excel Did Not Establish Cause for Dismissal Under Section 1112(b)(4)(A) or for Administrative Insolvency</u>.**

In addition to asserting bad faith, in the Motion to Dismiss, Male Excel also turned to Section 1112(b)(4)(A) as an additional cause for dismissal or conversion. Section 1112(b)(4)(A) provides:

> For purposes of this subsection, the term "cause" includes — . . . .
>
> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation . . . .

Looking a little more closely at the language of Section 1112(b)(4)(A), there are two elements: (1) a showing of substantial or continuing loss to or diminution of the estate; and (2) absence of a reasonable likelihood of rehabilitation. *In re Vaughan Co., Realtors*, 2013 WL 2244285 at *5 (Bankr. D.N.M. 2013). "This requirement is in the

conjunctive and it clearly is the burden of the movant to prove both of these elements." *In re Lykes Bros. S.S. Co., Inc.,* 196 B.R. 586, 595 (Bankr. M.D. Fla. 1996).

The first part of the statutory test focuses on whether the Debtor has suffered or continues to suffer negative cash flow or declining asset values resulting in loss to or diminution of the estate. In *Vaughan*, the court determined that the court should assess: "the bankruptcy estate's financial history and financial prospects and the financial records on file in the case." *Vaughan*, 2013 WL 2244285 at *6. The second part of Section 1112(b)(4)(A) concerns the "absence of a reasonable likelihood of *rehabilitation*." (Emphasis added.) Notably, Congress did not refer to a likelihood of "reorganization" in Section 1112(b)(4)(A). There is a distinction. "Rehabilitation" does not mean "reorganization." Instead, "'rehabilitation' is a different and, unfortunately for Debtor, much more demanding standard than 'reorganization.'" *In re Brutsche*, 476 B.R. 298, 301 (Bankr. D. N.M. 2012). In the context of Chapter 11 business bankruptcies, the term "rehabilitation" means to put back in sound financial condition and continue operating.

The Court assesses that Male Excel did not meet its Section 1112(b)(1) burden by establishing cause under the requirements of Section 1112(b)(4)(A). Male Excel did not prove declining asset values. And, the Debtor's cash flow history shows mixed results. From a strict cash perspective, the Debtor started the Second Bankruptcy Case with $49,380 and now has $284,546. The Debtor is current on its United States Trustee fees, insurance, and taxes. Notwithstanding, the Debtor's most recent Monthly Operating Report also shows that the Debtor has accumulated $242,903 in unpaid post-petition payables (mostly for unpaid professional fees), which is close to the Debtor's cash on hand. And, on an accrual basis, the Debtor's most recent Monthly Operating Report shows a cumulative loss of $21,126 during the pendency of the Second Bankruptcy Case. However, while the issue is close, the Court does not find the cumulative loss to be particularly substantial or continuous in the context of the Second Bankruptcy Case. Based on the Monthly Operating Reports and Mr. Fell's testimony, it appears that the Debtor currently is on a more positive financial trajectory which might support rehabilitation and continuing in business.

The Debtor also raised the point that the Debtor is allegedly administratively insolvent so dismissal or conversion is warranted. The Court views the proposition as largely subsumed in the Section 1112(b)(4)(A) analysis. Based on the foregoing circumstances and evidence, the Court is not convinced that the Debtor currently is administratively insolvent (although it might be close).

### 3. <u>Male Excel Did Not Establish Cause for Dismissal Based on Alleged Gerrymandering</u>.

For its last dismissal argument, Male Excel contended that the Debtor's Fourth Plan "demonstrates bad faith creditor class 'gerrymandering.'" The Court assesses that such argument really should be addressed in the plan confirmation process. The Debtor submitted the Fourth Plan. Male Excel objected to the Fourth Plan on a myriad

of grounds including alleged gerrymandering. The trial on confirmation of the Fourth Plan and Male Excel's many objections is set for December 17, 2026.[98] As a matter of judicial discretion, the Court assesses that it would be best to allow the parties to present evidence at the upcoming trial rather than making a spur of the moment decision on alleged gerrymandering in the Fourth Plan.

* * * * *

Given the foregoing lack of cause for dismissal or conversion under Section 1112(b)(1), the Court need not assess which specific remedy — dismissal versus conversion — would have been warranted if cause had been established.

## VII. Conclusion and Order.

For the reasons set forth above, the Court DENIES the Motion to Dismiss.

DATED this 30th day of September, 2026.

BY THE COURT:

Thomas B. McNamara,
United States Bankruptcy Judge

[98] Second Case Docket No. 395.